## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
**UNITED STATES OF AMERICA,**              )
                                                    )
                                                    )
                                                    )
                                                    )
            **v.**                                 )          **Criminal No. 15-10359**
                                                    )
**CARLOS CARABALLO BONILLA,**            )
                                                    )
            **Defendant.**                       )
                                                    )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **September 22, 2016**

### I.      Introduction

Defendant Carlos Caraballo Bonilla ("Bonilla") has moved to suppress a firearm and ammunition seized by the New Bedford Police on June 17, 2015. D. 44. Having considered the motion (and reply brief, D. 48), the government's opposition, D. 45 and the evidence (including testimony and exhibits) presented at the evidentiary hearing on the motion, D. 51, 56, the Court DENIES the motion. Accordingly, the Court makes its findings of fact and legal analysis below.

### II.     Findings of Fact

These findings are based upon the exhibits, Exhibits 1-10, and the testimony of New Bedford Detective Jonathan Lagoa ("Lagoa"), Detective Sergeant Evan Bielski ("Bielski") and Officer Carlos Depina ("Officer Depina") introduced at the suppression hearing. D. 53, 56.

####       A.      Information from the Confidential Informant

On June 17, 2015, at approximately 10:30 a.m., a confidential informant ("CI") contacted Lagoa. D. 53 at 6, 9, 13. Lagoa had previously received information from this CI, a heroin user, regarding three narcotics distributors in New Bedford, including information about their locations

and vehicles. Id. at 8, 33, 35, 38. This CI had only be activated by the police department sixteen days before he[1] called Lagoa on June 17th. 8/2/16 Hearing Day 2 transcript at 9. Although the CI had previously provided information, Lagoa had only recently begun to get information from him and he had only been paid for information on this one occasion. Id. at 35. Accordingly, the police department log of information provided by an informant listed only the information that the CI provided for the June 17, 2015 stop, but not any of information that the CI previously provided. Exh. 10; 8/2/16 Hearing Day 2 transcript at 7. This previous information had been corroborated by other members of the New Bedford Organized Crime Intelligence Bureau who had been conducting investigations of these distributors, id. at 8, 36, but such prior information had never been relied upon to obtain a search warrant, conduct a stop, make a controlled buy of narcotics or make an arrest. Id. at 35-36, 37; 8/2/16 Hearing Day 2 transcript at 8. To Lagoa's knowledge, the CI had not provided information that was false. Id. at 8-9.

During the call, that lasted approximately five minutes, the CI informed Lagoa that a man known as "Carlos" had a black firearm and ammunition. Id. at 9, 10, 11, 14. Although he mentioned both firearm and ammunition, the CI did not indicate whether the firearm was loaded. Id. at 45. The CI described Carlos as a thin Hispanic male wearing a black T-shirt and a black hat backwards. Id. at 10. The CI gave no further physical description and made no mention of tattoos. Id. at 47-48. He noted that Carlos was a known drug user and that he believed that he did not have a license to carry a firearm. Id. at 10. The CI further stated that Carlos was at 45 Nelson Street in New Bedford, but did not indicate in which unit at the multi-unit building there. Id. at 10, 41. The CI indicated that he had seen the firearm in Carlos's possession and had done so within the previous hour. Id.

---

[1] Although the Court uses the pronoun "he" to refer to the CI, the gender of the CI has not been disclosed.

Lagoa was familiar with the 45 Nelson Street address since the police had received multiple tips from confidential informants about drug activity there, although not associated with any particular unit in the building, but with all of the units there.  Id. at 11, 40.  From prior visits there, Lagoa knew that there was a multi-unit dwelling at that address and that it was located in the South End of the city.  Id. at 11-12.  This area, approximately eight to ten square miles in the city, is considered a high-crime area, known for violent crimes, narcotics investigations and a gang presence.  Id. at 12-13, 39, 83.  The day before receiving the information from the CI regarding this matter, there had been shots fired two blocks away, but an arrest regarding that matter had been made already at the time of the CI's call to Lagoa and he was not aware that the police were looking for any other suspects in connection with that matter.  Id. at 13, 44-45.

### B.      Surveillance Around 45 Nelson Street

In response to the CI's call, Lagoa contacted two uniformed officers, Depina and Bielski, to, in Lagoa's words, "assist in stopping Carlos, if he left the residence of 45 Nelson Street."  Id. at 15, 81-82, 108.  Lagoa wanted them to assist in this way since they were in uniform and he was not.  Id.  Lagoa spoke first with Depina, conveying the information from the CI including the description of Carlos.  Id. at 15-16; 139.  He asked the officer to stay off Nelson Street so that Carlos would not be alerted to any police presence.  Id. at 16.  Lagoa then had a similar conversation with Bielski.  Id. at 16, 81.

Lagoa himself traveled to the area of 45 Nelson Street, arriving approximately ten-twenty minutes after his call with the CI, to begin surveillance.  Id. at 14, 17, 18.  He parked on Nelson Street, east of County Road, a number of houses down from 45 Nelson Street.  Id. at 18, 49-50; Exhibits 1-3.  Lagoa was not sure how long he conducted surveillance, but estimated that it was longer than fifteen minutes, but less than thirty minutes.  Id. at 62.  From this location, he observed

a male of thin build wearing a black T-shirt and black hat.  Id. at 18, 55.  This individual appeared

on the porch of 45 Nelson Street for a short time and then began to walk down Nelson Street, away

from the area in which Lagoa was parked.  Id. at 18.  Upon this observation, Lagoa radioed Depina

and Bielski to report his observations and the fact that the male was walking west on Nelson Street

so that they could proceed in that direction.  Id. at 18, 63.  Lagoa began to drive west as well,

slowly approaching and then passing the male and observing that his appearance appeared

consistent with the information that the CI had provided.  Id. at 19-20, 55.  Upon such further

observation, Lagoa again radioed the other officers to indicate that this was probably the individual

that the CI had described.  Id. at 19.  As Lagoa passed the male and turned on Crapo Street, he saw

his two fellow officers approaching the corner.  Id. at 67; Exhibit 6.  Lagoa did not stop at that

point, but circled around the block.  Id. at 20-21.  Upon doing so, which took approximately two

minutes, he saw that the other two officers had stopped the male, later identified as Bonilla, near

the corner and were lifting him off the ground in handcuffs.  Id. at 21, 69-70, 77.  Lagoa, who was

driving an undercover vehicle, did not stop at the scene, but instead headed back the police station.

Id. at 21, 72.

### C.  Stop of Bonilla

Bielski and Depina, at Lagoa's request, had set up surveillance in the vicinity, near Jouvette

and Crapo Streets.  Id. at 86.  Approximately ten minutes after arriving, Bielski received a

transmission from Lagoa that he had observed a male fitting the CI's description walking out of

45 Nelson Street, heading west.  Id. at 87.  Following this call, Bielski and Depina, who were in

separate marked cruisers, met up near Crapo Street and began walking down Nelson Street.  Id. at

88-89, 92, 141; Exhibit 7.  Both officers had firearms; as the two walked toward Nelson Street,

Officer Depina unholstered his firearm and was carrying it at his left side.  Id. at 92-93, 143-45.

As the officers got to the corner of Crapo and Nelson Streets, a Hispanic male, wearing a black shirt and black hat, later identified as Bonilla, came around the corner. Id. 93-94; Exhibit 6. Depina indicated that Bonilla appeared "nervous and stunned." Id. at 147. He was concerned about Bonilla pulling a firearm on the officers. D. 53 at 177. The two uniformed officers were walking shoulder to shoulder. Id. at 113-14, 160. The officers' first exchange with Bonilla was Depina immediately ordering him to get down on the ground. Id. at 94, 114, 148, 160. Depina still had his firearm out, down at his side. Id. at 161. After Bonilla complied, Depina holstered his firearm and put him in handcuffs and Bielski turned him on his right side. Id. at 94, 97, 148. As Bielski rolled him on to his right side, he observed a firearm tucked into his waistband. Id. at 98, 149. Bielski alerted Depina to the presence of the firearm and removed it from Bonilla's person. Id. at 99, 172. Bielski then informed him of his Miranda rights. Id. Once they discovered the firearm, they called Lagoa to inform him of this discovery. Id. at 131. The officers then stood the handcuffed Bonilla up and conduct a pat-frisk in which Bielski discovered a magazine loaded with five rounds of ammunition in his back right pants pocket. Id. at 100, 149-50. After getting Bonilla's name, date of birth and social security number, id. at 102, Bielski called in this information to run a criminal history check. Id. at 105. This check confirmed that Bonilla did not have a license to carry a firearm. Id. at 106. The officers arrested Bonilla and Depina transported him to the police station. Id.

## III.   Discussion

### A.    The Police Had Reasonable Suspicion to Stop and Frisk Bonilla

It is well settled that to effectuate an investigatory stop, the police need reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). That is, the stop must "be supported by a reasonable and articulable suspicion of criminal activity . . . and that the

detention must be reasonable under the circumstances." United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001). For a Terry stop, the government must show that the stop was both "justified at [its] inception" and reasonable in terms of its scope. Id. at 6. "'[A] fact that is innocuous in itself may in combination with other innocuous facts take on added significance'" which may "culminate[ ] in reasonable suspicion." United States v. Wright, 582 F.3d 199, 212-13 (1st Cir. 2009) (quoting United States v. Ruidiaz, 529 F.3d 25, 30 (1st Cir. 2008)).

Moreover, information from a tipster may provide reasonable suspicion if it possesses sufficient 'indicia of reliability.'" United States v. Sanchez, 817 F.3d 38, 42 (1st Cir. 2016) (quoting Florida v. J.L., 529 U.S. 266, 272 (2000)). If an officer makes a stop in reliance upon a tip the tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Id. (citing J.L., 529 U.S. at 272). The reliability of a tip is greater if the tipster is known to police officers and has provided reliable information in the past. See Sanchez, 817 F.3d at 43 (citing J.L., 529 U.S. at 270; United States v. Jones, 700 F.3d 615, 621-22 (1st Cir. 2012)). Moreover, the reliability of a tip is bolstered where it consists of detailed, rather than general, information and where the informant had observed the defendant with his or her own eyes as a "clear basis of knowledge." See Sanchez, 817 F.3d at 43 (citing Illinois v. Gates, 462 U.S. 213, 234 (1982)).

The officers here had reasonable suspicion to stop Bonilla not just based upon the information from the CI, but as corroborated by their surveillance. Although Bonilla contends that the information that the CI provided was too vague, the CI gave a name ("Carlos"), physical description (thin Hispanic male) at a definitive place (45 Nelson Street) and that he was carrying a black firearm and ammunition. See United States v. Brown, 500 F.3d 48, 55-56 (1st Cir. 2007) (rejecting a similar argument and reasoning that "the police were not simply looking for a black

man; they were looking for a black man getting off the afternoon bus from New York City on July 29"). As Lagoa testified, the CI indicated that this information was based on his personal observation within the preceding hour of calling the detective. Moreover, the additional information that the CI provided—namely, that Carlos was a known drug user and that he believed that he did not have a license to carry, D. 53 at 10—also indicates personal familiarity with Carlos and his circumstances.

The Court disagrees with the defense's characterization of the CI as a "first-time" informant. The police conceded that June 17th was the first time that this CI provided information that resulted in a stop, seizure or arrest, but that he had previously provided other information about drug distributors that had been corroborated by law enforcement in ongoing investigations. That is, even if this CI had a short track record, he had some record of reliability for providing truthful information. Additionally, the fact that the CI's identity was known to the officers (and thereby subject to some sanction if he was untruthful) distinguishes him from the anonymous tipster in <u>Florida v. J.L.</u>, 529 U.S. at 268.

In addition to some track record of reliability, the officers were able to corroborate key components of the CI's information with independent investigation, namely surveillance at and around 45 Nelson Street, shortly after receiving the information from the CI. Lagoa was able to observe a person consistent with the CI's description on the porch of 45 Nelson Street and, upon passing him closely when he left the address, observed that he fit the description of a thin Hispanic male wearing a black shirt and black hat. That the CI may no mention of tattoos that appear on Bonilla's neck and arms, D. 44-3, in his description does not negate the reliability of the CI's information where the officers were able, upon personal observation, to corroborate other aspects of that information regarding the description and his appearance at and around 45 Nelson Street,

the locale where the CI had reported seeing him with a firearm and ammunition.  That the officers might have done more to investigate is true, but that does not undermine the fact that the officers received information from a person known to them, who over the prior few weeks had provided reliable information to police and they were able to corroborate, with surveillance, several aspects of the CI's description here.

Although the defense criticizes Lagoa for failing to have the CI clarify whether his report that Carlos had a firearm and ammunition meant that the firearm was loaded, it was certainly reasonable for the police to be concerned that this individual was carrying a loaded firearm at the time that they encountered him on Nelson Street.  "[I]n determining whether a pat-down search is an appropriate step following a valid Terry stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" United States v. Cardona-Vicente, 817 F.3d 823, 827 (1st Cir. 2016) (quoting United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)); see Terry, 392 U.S. at 27.  Here, the officers had a reasonable basis for believing that he was armed and dangerous.  Although the Court agrees with the defense that generalized concerns about the large, general area being a high-crime area alone would not satisfy this showing, that was not only factor that the officers had to consider.  They had information from a reliable source that the individual had a firearm and ammunition, was a drug user, was believed not to have license to carry and they had corroborated through surveillance that this individual had just left 45 Nelson Street, not just the address where the CI had recently seen him, but an address previously known to the police for drug dealing.  Regardless of the time of day, this totality of circumstances gave the police a reasonable basis to believe that Bonilla was armed and dangerous.  Accordingly, both the basis for the stop and the scope of the ensuing frisk was reasonable.

Moreover, considering the facts and circumstances of this case, the manner in which the officers initiated the stop—by ordering Bonilla to the ground and handcuffing him—did not convert the stop into a *de facto* arrest.  A *de facto* arrest occurs "'when a reasonable person in the suspect's position would have understood, given the circumstances, that he was essentially under arrest.'"  United States v. Carrigan, 724 F.3d 39, 47 (1st Cir. 2013) (quoting United States v. Mohamed, 630 F.3d 1,6 (1st Cir. 2010).  The police "may take physical control of and handcuff a person without turning a Terry stop into a *de facto* arrest when it is necessary 'to protect their own safety and the safety of others in the area.'"  Carrigan, 724 F.3d at 47 (quoting Mohamed, 630 F.3d at 6).  Accordingly, the Court must examine the reasonableness of the police's conduct in the context of the facts and circumstances of the stop.  Mohamed, 630 F.3d at 6; see United States v. Chaney, 647 F.3d 401, 409 (1st Cir. 2011).  Bielski and Depina came upon Bonilla after the police had received recent information of his presence at 45 Nelson Street with a firearm and ammunition, being a known drug user in a place known for same and that he was believed not to have a license to carry.  Depina also testified that Bonilla seemed nervous and stunned to encounter the police as they met at the corner of Nelson Street.  Given these particular circumstances, the Court cannot conclude that it was unreasonable for the officers to order Bonilla and then handcuff him to conduct the Terry stop.  Carrigan, 724 F.3d at 47-48 (concluding that Terry stop was not converted into a de facto arrest where the officers forcibly seized and handcuffed defendant given the officers' suspicion that he was armed and that they were confronting him in a confined space where his car was still running and was in drive).  While handcuffing and use of a drawn gun (here, Depina had his firearm out and on his side) "will generally tilt the scale to some significant degree toward a finding of de facto arrest . . . neither factor is alone determinative."  Chaney, 647 F.3d at 409.  Contrary to Bonilla's suggestion, the officers' approach was not one in which they had no

information or no cause for concern about safety.  Here, where the officers came face to face with Bonilla, knowing that they had received information from a reliable source that he was armed and believed not to have a license to be so armed, a drug user emerging from the address known for same.  For these reasons, the Court does not conclude that the <u>Terry</u> stop supported by reasonable suspicion became a *de facto* arrest.

**IV.     Conclusion**

For all of the aforementioned reasons, Bonilla's motion to suppress, D. 44, is DENIED.

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge